THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN SMITH, a/k/a Darryl Williamson, Defendant-Appellant.

First District (5th Division)   No. 1—89—3178

Opinion filed February 26, 1993.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Michael J. Pugh, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Kevin Smith was found guilty of first-degree murder and armed robbery and was sentenced to concurrent terms of natural life for the murder and 30 years for the armed robbery. On appeal, defendant contends that the trial court abused its discretion in refusing to instruct the jury on the offense of second-degree murder and that the trial court abused its sentencing discretion.

On September 27, 1987, Vipinchada Patel was working as a cashier at the parking garage of the Days Inn Hotel in Chicago. Liaget Ali was working at the front desk of the hotel until approximately 11:40 p.m., when he went to the parking garage in order to retrieve his car. Ali gave Patel his ticket and then drove to the front of the hotel. As he was doing so, Ali heard a gunshot from the garage and 10 seconds later heard two more gunshots. Ali drove to the entrance of the garage and saw a black car and a light-colored car rush out of the garage. He went to the ticket booth and discovered that Patel had been shot.

The medical examiner who performed the autopsy on Patel testified that Patel had one gunshot wound to his right temple and one to his right upper back. The shots had been fired within two feet.

Detective Sikorski testified that the security video tape of the garage on the night in question showed that at 11:45 p.m., there was an automobile in the outbound lane of the ticket booth. The first digit or letter of the license plate could not be made out, but it was deter-

mined that the second letter was P, and the rest was either 7212 or 2212.

John Pemberton testified that on September 25, 1987, his car, with Illinois license plate number JP 2212, was stolen from the Days Inn Hotel parking garage. Officer Moran testified that cars on the fourth and fifth floors of the parking garage had been broken into. Fingerprints were lifted from these cars. The police also discovered two cars, in the area of 5429 West End in Chicago, which had been stolen from the Days Inn parking garage on the night in question. In one of these cars, the police recovered a parking receipt from the Days Inn and a Chicago-area street map.

Detective Rothgeb testified that he received a surveillance assignment of an automobile suspected in the homicide of Patel. This automobile was a dark blue Oldsmobile with Illinois license plate number JP 2212. The automobile was parked at 513 South Lotus Avenue, which was approximately one mile from 5547 West End and one-half mile from 5560 West Quincy. The next day Officer Lullo began surveillance at 5560 West Quincy. He observed a red van with the license plate number HRZ 3631 leaving that address. This license plate number matched that of the number written on the back of the ticket stub recovered from the Days Inn ticket booth, having an exit time of 11:39 p.m., dated September 27, 1987. Officers stopped the van and arrested defendant and Guy Murray. Andre Carroll was later found hiding under some towels in a bathroom at 5560 West Quincy and placed under arrest.

Officer Hawkins, one of the officers who arrested defendant, testified that he asked defendant "where he had obtained control over the van." Defendant responded that a person, whose name he did not know, told him to move the van to the front of the house at 5560 West Quincy. Hawkins testified that defendant was limping and his leg seemed to be injured. Defendant told Hawkins that he had shot himself while standing on the corner of Madison and Parkside Avenues in Chicago. Defendant later told Officer Hawkins that he was shot on a street corner in Detroit.

On October 2, 1987, defendant was taken to Cook County Hospital in order to have a bullet removed from his leg. On that same day, Officer Collins examined the 1987 Oldsmobile, Illinois license plate JP 2212, and discovered a bloodstain on the driver's front seat. A bloodstain was also found on the passenger side front seat of the van. The ticket stub recovered from the ticket booth had Andre Carroll's fingerprints on it. The palm print recovered from the Oldsmobile on the fifth floor of the parking garage was that of defendant.

Robert Smith, a firearms examiner, testified that the fired bullet which was recovered from the ticket booth, the bullet recovered from Patel's spinal cord, and the bullet removed from defendant's leg were all fired from the same gun.

After defendant was taken to the police station and given his *Miranda* warnings, defendant gave a statement that he lives in California and came to Chicago with four men in order to rob a jewelry store. On September 27, 1987, defendant and three other men set out to steal three cars for use in robbing a jewelry store. All four men rode in a van driven by "Truck." "Truck" brought along a .38 revolver and set it on the floor. Defendant picked up the gun and put it by his right side. The four men decided to steal cars from the parking lot at the Day's Inn Hotel. They went to the upper floors of the garage and began breaking into cars. Defendant brought the gun with him "in case something went wrong." After stealing three cars, the group began to leave. "Truck" paid Patel and drove out of the garage. Defendant did not have any money, so he got out of his car, pointed the gun at Patel and demanded he open the gate. Patel said, "Okay." As he was getting back into the car, defendant put the gun back in his pocket and then he heard a gunshot. Defendant testified that at first he thought Patel was shooting at him. Defendant then shot Patel twice because he could not see Patel's hands. As defendant and the other men fled the scene, defendant realized he had shot himself in the leg.

■ Defendant first contends that in light of the statement he gave to the police, the trial court should have instructed the jury on the offense of second-degree murder. The crime of second-degree murder occurs when an accused kills a victim with an unreasonable belief in the need for self-defense. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2).) An instruction for self-defense is given in a homicide case where there is some evidence in the record which, if believed by the jury, would support a claim of self-defense. *People v. Everette* (1990), 141 Ill. 2d 147, 565 N.E.2d 1295.

Defendant relies on *People v. McCarroll* (1988), 168 Ill. App. 3d 1020, 523 N.E.2d 150, in support of his argument that a second-degree murder instruction should have been given. In *McCarroll*, defendant walked into a gas station with a loaded automatic pistol. Defendant testified that he had been jumped and stabbed the week before, and the gun was for his protection. Defendant gave the victim $20 for cigarettes and the victim refused to give him change, stating that he had received only $1. The victim swore at defendant and told him to leave, but defendant refused to do so. The victim reached for a

gun, the defendant rushed at the victim and grabbed him from behind, causing the victim's gun to fall to the floor. As they struggled, the victim began to pull out defendant's gun from defendant's waistband. As the men were struggling for the gun, the gun fired and struck defendant. Based on this evidence the court found that an instruction on involuntary manslaughter was justified.

We are not persuaded that *McCarroll* supports defendant's contention that a second-degree manslaughter instruction should have been given since that case is factually dissimilar from the instant case. In *McCarroll*, there was some evidence that the victim was the initial aggressor. In contrast, defendant here confronted an unarmed victim with a deadly weapon and demanded that he open the exit gate to the parking lot. In addition, the evidence showed that throughout his entire encounter with Patel, defendant was the aggressor. (See *People v. Sloan* (1986), 111 Ill. 2d 517, 490 N.E.2d 1260 (defendant was not entitled to an instruction on self-defense or voluntary manslaughter because defendant was the aggressor and the victim's slight display of force or resistance was provoked by defendant's own conduct); *People v. Shelton* (1985), 140 Ill. App. 3d 886, 498 N.E.2d 879.) Defendant's own statement revealed that defendant went to the Day's Inn garage armed with a gun, pointed the gun at Patel and threatened to shoot Patel if he did not open the gate. Patel was unarmed and never took an aggressive role in the confrontation. Despite the fact that Patel complied with defendant's order and opened the gate, defendant fired two shots into Patel at a close range. There is no evidence that defendant was retreating in any way when the shooting occurred. For these reasons, we find that the trial court did not abuse its discretion when it refused to instruct the jury on unreasonable self-defense.

■■ Defendant's next contention is that it was improper for the trial court to order him to appear and show his tattoos at codefendant's trial without the benefit of counsel and then to consider his conduct at codefendant's trial as a factor in aggravation at defendant's sentencing hearing. Defendant was found guilty on May 11, 1988. Defendant's sentencing hearing was continued so that codefendant's trial could be completed before the trial court sentenced defendant. Codefendant Andre Carroll's trial commenced on September 22, 1989. During codefendant's trial, but outside the presence of codefendant's jury, the State requested permission to exhibit defendant and his tattoos to codefendant's jury in order to show that Carroll and defendant had common and unique tattoos, thereby linking Carroll to certain pieces of evidence. Codefendant's attorney objected, noting that

defendant "has a case in this courtroom relative to the same incident. He has a lawyer, Mr. King, who represents him, and Mr. King isn't here." The court overruled the objection, stating that because defendant was only being asked to display his tattoos, there was no violation of his fifth amendment rights. The trial court first ordered defendant to display his tattoos to the jury but defendant refused, stating that he was incriminating himself and further demanding that his lawyer be present. The judge then informed defendant that they would discuss, at defendant's sentencing hearing, defendant's conduct in the courtroom. After several minutes of heated discussion between defendant and the trial judge, codefendant's attorney stated that he spoke with defendant's attorney, Mr. King, and that Mr. King objected to defendant being brought before the jury as an exhibit. The trial court noted the objection but still ordered defendant to display his tattoos before the jury. Later, however, the court reconsidered the issue, noting that defendant's conduct before the court indicated that he may act out in front of the jury and prejudice Carroll's trial. The court therefore ordered defendant to display his tattoos to Detective Rothgeb, a prosecution witness, in front of the judge but outside the presence of codefendant's jury. At this time, defendant made several disparaging and vulgar remarks to the trial court, while continuing to claim that he could not be forced to appear at codefendant's trial and show his tattoos since his attorney was not present. The trial judge again stated that he would take defendant's conduct into consideration when sentencing defendant. Detective Rothgeb later testified in codefendant Carroll's trial to the presence of defendant's tattoos.

At defendant's sentencing hearing, the prosecutor reminded the trial court of what had occurred at codefendant's trial, at the confrontation between the defendant and the judge outside the presence of codefendant's jury, emphasizing defendant's tattoos and the vulgar language the defendant used at that time when speaking to the trial judge. In sentencing defendant, the judge did not mention explicitly defendant's offensive language referred to above, but clearly relied on defendant's tattoos as a factor in aggravation at defendant's sentencing hearing when he stated:

> "It was in fact an ill wind of the strong smell of garbage that blew Mr. Smith and his cohorts to Chicago. He came to this state from California on a hit and run mission with the intention of reeking mayhem and then returning to California.
>
> *He bears on his body the tattoos which are obscene symbols of his absolute lack of respect for what is decent in society.*

Mr. Smith chose to come to Illinois. He may now stay here. He is sentenced to natural life without parole on the murder." (Emphasis added.)

While the court may consider defendant's conduct and demeanor, as well as the evidence produced at trial, as factors in aggravation in sentencing defendant, the trial court's observation of defendant usually occurs in a proceeding related to defendant's own trial. What is unique and problematic about the issue presented here is the fact that defendant's tattoos came to the trial court's attention not during defendant's trial or sentencing hearing, but when defendant was ordered to display his tattoos to the court in codefendant's entirely distinct and separate trial over objections of codefendant's counsel. When the trial court ordered defendant to provide his body as evidence in a proceeding unrelated to defendant's trial and sentencing hearing and had this encounter with defendant, he stepped out of the role of an impartial arbiter and became a witness. The trial court is entitled to consider only that information that comes to its attention during the defendant's trial and sentencing proceedings, where defendant has been provided with the safeguards he is entitled to receive, including the presence of an attorney.

Finally, the trial judge was not free to ignore the fact that although he was presently presiding over codefendant's trial, he was yet to sentence defendant, who had already been convicted of Patel's murder. Under those circumstances it was particularly important that the court avoid a confrontation with defendant in a related but separate proceeding at which he was without benefit of counsel. Assuming without deciding that a description of defendant's tattoos were relevant, probative and admissible at codefendant's trial, a method to obtain this evidence should have been devised that avoided the necessity of a confrontation between defendant and the trial judge who was to preside over defendant's sentencing.

Accordingly, for the reasons set forth above, we affirm defendant's conviction and reverse defendant's sentence and remand for a new sentencing hearing before a different judge.

Affirmed in part and reversed and remanded in part.

GORDON, P.J., and MURRAY, J., concur.